UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

**Eastern District of Kentucky**
**FILED**

AUG 2 4 2005

AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 04-470-GWU

SHARLENE BURKE
FOR ASHLEY R. BURKE,                                         PLAINTIFF

VS.                          **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY                  DEFENDANT

### INTRODUCTION

Sharlene Burke appeals from the negative administrative decision on her daughter Ashley R. Burke's application for Child's Supplemental Security Income (SSI) benefits. The case is before the Court on cross-motions for summary judgment.

### LAW APPLICABLE TO CHILD'S SSI BENEFITS

As of 1996 <u>strict</u> standards for child's SSI claims were adopted. The Welfare Reform Act, P.L. No. 104-193, 110 Stat. 2105, provides that:

> An individual under the age of eighteen (18) shall be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than 12 months.

Thus, a child's SSI claim can be granted now only if there is a "marked and severe functional limitation(s)." The impairment must meet, medically equal, or functionally

Burke for Burke

equal in severity one of the Listing of Impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 2. 20 C.F.R. Section 416.924.

The implementing regulations require the agency to determine if the child's impairment(s) meet any Listing of Impairments sections found at 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. Section 416.924. If this step is not satisfied, the fact finder is required to consider limitation of specific functioning, broad areas of development or functioning, episodic impairments, and limitations related to medication effects to determine "functional equivalence" to the LOI. Section 416.926a. Functional equivalence is established if the child has one area of extreme functional limitations (i.e., very serious interference with functioning) or two areas of marked limitation (i.e., serious interference with functioning). Id.

## DISCUSSION

The administrative law judge (ALJ) found that Ashley suffered from a conduct disorder and a seizure disorder, but that these conditions did not meet or medically equal any section of the Listing of Impairments. (Tr. 24). He believed that Ashley had no limitations in functional domains related to using/acquiring information, interacting and relating with others, manipulating objects and caring for herself. (Tr. 22-23). He opined that she had less than marked limitation in attending and completing tasks and a "marked" limitation in the health and physical well being domain due to her seizures. (Tr. 22-24). This, however, was insufficient to

8192

establish a functional equivalence of a Listing and benefits were denied. (Tr. 24-25).

Ashley's protective filing date was July, 2002 (Tr. 56)[1] and the only source of disability alleged at that time related to having seizures (Tr. 61). Later, her mother mentioned attention deficit hyperactivity disorder. (Tr. 71).

Other evidence from non-medical personnel included school records. In late 2002, two teachers indicated that Ashley had difficulty staying focused and working independently, which they believed might be due to her seizure medication. (Tr. 92, 93). Nevertheless, Ashley's first grading period records for the 2002-2003 school year showed her to have average progress in almost all subjects and to be at an age appropriate level in all subjects. (Tr. 132). A detailed teacher questionnaire from early 2004 (fourth grade) indicated that she was average academically, and was shy but becoming more outgoing; the teacher reported that Ashley occasionally "spaced out" because of seizures, but apparently she had not personally observed this, as she added the words indicated that she "had been told" about these spacing out incidents. (Tr. 13-135). A 1998 school medical examination by a nurse practitioner was all normal by result. (Tr. 115). Thus, none of this information

---

[1] The proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after her application date. Casey v. Secretary of Health and Human Services, 987 F.2d 1230, 1233 (6th Cir. 1993).

Burke for Burke

depicted Ashley as disabled, or clearly significantly limited beyond that of the average child.

Records from the Lake Cumberland Regional Hospital covered a slightly earlier period, from December, 2001 to July, 2002. Seizure activity was reported by the parents in December, 2001 but no seizures were seen in the Emergency Room (Tr. 165) and a CT scan of the brain was normal (Tr. 166). The patient was also seen for complaints of seizures in May, 2002, but had no such problems in the Emergency Room (Tr. 149) and it was noted that an EEG had been negative (Tr. 147). A cursory physical examination was unremarkable as well. (Id.). Again, no indication of disability of significant functional limitation was spelled out.

Bobby Kidd performed a consultative physical examination in late 2002. The examination was normal, although the physician noted the mother's history of grand mal seizures. (Tr. 173).

A consultative mental health evaluation was performed in October, 2002 by Blaine J. Pinaire, who indicated that a confusing picture was presented diagnostically and no active diagnosis could be made on Axis I or Axis II. (Tr. 175). Pinaire also deferred any reference to a GAF. (Id.). The examiner noted that the problems had begun six months or less before (i.e., not at full 12 months), and that the child was currently able to perform daily living activities at an age appropriate manner. (Tr. 176).

Burke for Burke

Records were also submitted from a treating facility, the office of Piyush D. Patel. Patel's physician's assistant conducted an initial evaluation of Ashley in November, 2002. No physical abnormalities were detected, and the patient was described as alert. (Tr. 179). While she was hyperactive, she could be briefly redirected. (Id.). A GAF of 60[2] was assigned and under Axis I "rule out attention deficit disorder with hyperactivity" (Id., emphasis added). The impression of Patel himself, who later saw Ashley, was that she was "on most part" calm, but he diagnosed ADD with hyperactivity and he put the plaintiff on Strattera. (Tr. 232). Strangely, in February, 2003, the patient was described as not squirming, reportedly improved and less aggressive, yet a lower GAF of 50[3] was assigned; it was noted as part of the patient history that Ashley had not had any seizures since the previous October. (Tr. 231). In March, she was described as focused and cooperative, with good judgment and insight for her age and a calm affect, but was still strangley given the same lower GAF score. (Tr. 230). In April, the same notations were made by the examiner, with the patient even being noted to be

---

[2]Scores between 51 and 60 are consistent with "moderate . . . difficulty in social, occupational or school functioning", and those between 61 and 70 are consistent with "some mild symptoms . . . but generally functioning pretty well" as per the Diagnostic and Statistical Manual of Mental Disorders (4th Ed.) (DSM-IV).

[3]Scores between 50 and 41 are consistent with "serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job" as per the Diagnostic and Statistical Manual of Mental Disorders (4th Ed.) (DSM-IV).

Burke for Burke

"pleasant" and average in intelligence. (Tr. 229). The rest of the 2003 and 2004 information brought a reported "spell" of incoherence at school which might or might not have been related to an injury received from her cousin (Tr. 240) but by October, 2003, her mother was reporting Ashley was on the honor roll and had been doing well while the psychiatrist observed focused, cooperative behavior with good eye contact and appropriate mood. (Tr. 239). An EEG done about that time was normal. (Tr. 238). School reportedly continued to go well as of December and the psychiatrist found her to have a full affect, calm mood and logical thoughts. (Tr. 237). Thus, through 2003, the psychiatrist's notes certainly did not reveal a disabling condition despite the lower GAF cited; indeed, the notes appear patently inconsistent with the GAF cited. Patel reported some worsening of symptoms on the last two visits, but even in April, 2004 the patient was seen as focused, alert and calm. (Tr. 235). Even with the last information, the descriptive information provided by Patel does not indicate that the plaintiff's least effective level of functioning, such that it was, lasted anything close to a year.

Another treating source, for the plaintiff's seizure condition, was the University of Kentucky Department of Neurology (the Kentucky Clinic), where records document that the plaintiff was seen between May and December, 2002. When first seen, the patient had just gone to the Emergency Room after experiencing a seizure, albeit reportedly all tests had been negative. (Tr. 196).

Burke for Burke

According to Ashley's mother, the patient had otherwise been doing "very well" in the second grade and was on no medication. (Tr. 198). An Assistant Professor of Neurology described the neurological examination as normal and noted that in general Ashley was very alert and cooperative. (Tr. 198). She was seen as being *interactive, bright, and social, and her higher cognitive functions appeared to be intact.* (Tr. 197). The neurologist felt that the "spells" experienced by the child were "likely benign rolandic epilepsy" and started her on Tegretol. (Id.)  When seen several weeks later by another neurologist at the facility, the plaintiff had had experienced no more seizures, but had developed a rash which caused a change in medication; the neurologist described Ashley as "happy, outgoing, [and] pleasant." (Tr. 194).  An EEG performed the same date was said to be abnormal, indicating "benign epilepsy of childhood with central temporal spikes." (Tr. 192). According to the patient history given at the next office visit, the new medication had been causing no side effects and the patient was described as "doing well" but had experienced two seizures since she had taken the new medication; the neurologist commented that the patient was alert, active, not in any distress and had normal general and neurological examination. (Tr. 189).  It was hoped that an increase in medication to the 400 mg. level would help the control of the complex partial seizures. (Id.).  When Ashley was next seen in October, the mother reported that the increased medication had brought behavioral and attention difficulties, so her

Burke for Burke

medication had been decreased; the patient reportedly still had some behavior difficulties and had a seizure shortly before the office visit. (Tr. 186).   The neurologist described her as "quite pleasant", alert, but anxious; the doctor felt that the behavioral difficulties could be multifactoral, and the anxiety could relate to concern about her diagnosis or because of the seizures. (Tr. 187).  She concluded that once good seizure control was achieved, if the patient continued to have behavioral problems, she could be put on medications for her behavior. (Id.).  In the meantime, the doctor recommended that her mother take her to see a mental health professional. (Id.)  An MRI of the brain done that November was normal. (Tr. 201.) In December, the doctor noted that the patient's neurological evaluation was unchanged and that she appeared to have no side effects from the "modest dose" of a new medication she had been placed on; as the patient's grades had improved and she appeared able to "warm up" during the interview, the doctor indicated that she was pleased with how Ashley had been doing behaviorly and academically and stated that "once we have achieved good seizure control, some of these problems might also get better."  (Tr. 183).

A letter from a therapist with Phoenix Preferred Care was submitted.  Dated January, 2003, the letter indicated that Ashley had become a client at the facility in November, 2002, shortly before the patient had been seen at Dr. Patel's facility. The facility staff provided in-school therapy for Ashley and collateral therapy for the

Burke for Burke

mother on a regular basis. However, according to the therapist, the facility staff had done no psychological evaluation and had placed the patient on no medication itself. (Tr. 205). Individual therapy notes were not, and would not be, provided; thus, the details provided in the letter appeared to be limited to "working" diagnoses for therapy of attention deficit disorder and oppositional defiant disorder, and very non-specific reports from school authorities about Ashley's tendancy to talk in class and some symptoms of depression exhibited by the client. (Id.). Thus, this letter, not from a psychologist or psychiatrist and not buttressed by specific progress notes, is of little assistance to the plaintiff.

The record was reviewed at this point by medical reviewers. Jo Anne Sexton and Ann Demaree both felt that the evidence showed that the plaintiff had attention deficit hyperactivity disorder, oppositional defiant disorder and seizures which were "severe" but did not meet or equal any section of the Listing of Impairments. (Tr. 207). Both reviewers felt that there were no limitations in acquiring and using information, and less than "marked" limitations in attending and completing tasks and interacting and relating with others. (Tr. 211). There was a "marked" limitation in the health and physical well-being domain, but there was a good prognosis with the new seizure medication. (Tr. 209). Lea Perritt and Dennis Penn, other reviewers, completed a separate form. They noted a "marked" limitation in health and physical well-being, but lesser restrictions for other domaines. (Tr. 217-219).

Burke for Burke

The record also contains the result of a one-time evaluation by Edward Lovelace, which took place in May, 2003. The examiner indicated that the child had frequent inappropriate shifts of attention and that she exhibited disorganized behaviors (Tr. 225), which were consistent with attention deficit disorder (Tr. 227). IQ test scores were recorded as being in the 40s (Tr. 225), consistent with moderate mental retardation (Tr. 226). He concluded that Ashley's current intellectual and emotional status had been severely impacted by her seizure disorder. (Tr. 226).The examiner opined that Burke should be a candidate for disability benefits. (Tr. 227).

It is noteworthy that some of the information noted in this report from Lovelace was contradicted by information from various sources in the record. Treating Mental Health Specialist Patel's notes for April, 2003 (six weeks before the Lovelace report), for example, describe the patient  as reportedly "less hyper"and exhibiting acceptable behaviors; Patel himself described Ashley as calm, pleasant, and of estimated average intelligence at that time. (Tr. 229). Patel's notes in March had suggested that the patient's teacher had reportedly noticed improved focus and behavior and that her grades had been "the same" (reportedly 1 A, 2 Bs, 1 C, and 1 F–rather than the "Ds and Fs" noted in the Lovelace report).  (Compare Tr. 230 to Tr. 224). The actual school records also do not appear to back up the academic information given to Lovelace as part of patient history.  See Tr.132.

Burke for Burke

Other evidence in the record for the later period <u>after</u> the Lovelace report certainly suggests that the low intellectual and other functioning may have been temporary. The Court also notes the fact that the plaintiff's mother apparently told Patel later, in October of that year, that the plaintiff had been on the Honor Roll at school.  Notations from her neurologist in December confirm that the patient was seen as doing better academically and from a behavior standpoint.

Reviewing the record as a whole, it does not appear that the plaintiff has established that she had two "marked" or one "extreme" limitation in functional domains.   In various categories, the evidence is clearly "mixed", and the administrative law judge was justified in finding that benefits could be denied.[4]

This the 2�4 day of August, 2005.

G. WIX UNTHANK
SENIOR JUDGE

---

[4]The plaintiff makes no specific argument regarding the GAF scores of record noted by Patel, or Lovelace's report.  Even if such arguments had been made, given Patel's descriptions and the other evidence of record, these arguments could hardly have been persuasive.